

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 21, 2016

<u>Via ECF</u>

The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *United States* v. *Henry Torres*, 13 Cr. 611 (LAP)

Dear Judge Preska:

The Government respectfully submits this letter in connection with the sentencing of defendant Henry Torres, a/k/a "David" (the "defendant" or "Torres"), scheduled for November 22, 2016 before Your Honor, and in response to the defendant's sentencing memorandum dated October 18, 2016 ("Def. Mem.").

The defendant has a United States Sentencing Guidelines ("Guidelines") range of 108 to 135 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR") dated October 18, 2016, in which the Probation Office recommends a sentence at the bottom of the Guidelines range. The Government has no objections to the PSR, and respectfully requests that the Court impose a sentence within the applicable Guidelines range, which appropriately captures the defendant's conduct and role in this international narcotics trafficking enterprise.

<u>Background</u>

In or about December 2011, the United States Department of Homeland Security, Homeland Security Investigations ("HSI") New York Border Enforcement Security Task Force (the "Task Force") began investigating a significant drug trafficking organization (the "DTO") based in the Dominican Republic, which regularly shipped kilogram-quantities of cocaine on container ships from ports in South America to the continental United States for distribution (PSR ¶ 8). The DTO was led by Hendrick Antonio Gil, a/k/a "El Pintor," a/k/a "Da Vinci," a/k/a

"Henry" ("Gil") from the Dominican Republic, who would obtain and orchestrate the large shipments of cocaine from the DR, and who worked with trusted criminal associates in the New York area, who would in turn discretely receive and distribute these shipment of cocaine at his direction (PSR ¶¶ 9-10).

On or about January 11, 2012, a confidential source (the "CS") met with Gil in the Dominican Republic, at the direction of law enforcement (PSR ¶ 11). During the meeting, the CS and Gil discussed, in substance and in relevant part, the prospect of a large shipment of cocaine from Ecuador to New York, and the CS claimed to have a relative employed at a certain seaport in New York, who had the ability to take possession of kilogram-quantities of narcotics from shipping containers without the detection of law enforcement, for payment of $4,000 per kilogram (PSR ¶ 11). Gil then put the CS in touch with one of his New York associates, Victor Guzman, a/k/a "Vito" ("Guzman") (PSR ¶ 11).

On or about January 23, 2012, a law enforcement agent acting in an undercover capacity (the "UC") called Guzman (PSR ¶ 12). During this call, the UC claimed to be reaching out on behalf of the CS, and stated that he worked as a longshoreman at a certain container terminal in Brooklyn, New York (the "Terminal") and was seeking to make extra money (PSR ¶ 12). The UC and Guzman then arranged to meet in person at a restaurant in Harlem (PSR ¶ 12). That meeting occurred two days later, on or about January 25, 2012 (PSR ¶ 13). During the meeting, the UC provided a list of container ships that were due to arrive at the Terminal within the next several months, and Guzman discussed the great potential in the endeavor to either make lot of money or end up in jail (PSR ¶ 13).

In February, March and April 2012, Guzman, Gil, the CS and the UC remained in touch, both via text-message (PSR ¶ 14) and in person in the DR (PSR ¶¶ 15-17), concerning the logistics and timing of the shipment of cocaine, and the ready availability of customers in New York. Finally, on or about May 6, 2012, their plans "crystallized" (PSR ¶ 18) – the UC received a call from Guzman and the defendant, and made plans to meet them in person the following day (PSR ¶ 19).

Indeed, on or about May 7, 2012, the UC met with Guzman and the defendant at the Terminal (PSR ¶ 21). During this meeting, which was recorded, Guzman and Torres informed the UC, in substance and in part, that they had already spoken to Gil, and that the plan was to send 50 kilograms of cocaine as the first shipment to the Terminal (PSR ¶ 21). Guzman, the defendant, and the UC then discussed the manner of payment to the UC for his removal of the narcotics shipment from the container (PSR ¶ 21). The defendant also suggested that they all purchase new cellular phones, to avoid detection by law enforcement in connection with the expected shipment.

In June and August 2012, Gil continued to orchestrate and communicate about the shipment of cocaine from Ecuador to the U.S. on behalf of the DTO (PSR ¶¶ 22-24). According to flight records, on or about September 14, 2012, the defendant flew from New York to Guayaquil, Ecuador (PSR ¶ 25). The defendant had booked a return trip to the United States from the

Dominican Republic, that departed on February 21, 2013 (PSR ¶ 25). [1]  In November and December 2012, the UC received more communications from Gil, concerning his coordination of the cocaine shipment from Ecuador and explanations for the lengthy delay (PSR ¶ 26).

About two months later, on or about February 11, 2013, Gil put the UC in touch with another of his New York associates, Domingo Eladio Guerrero, a/k/a "Black" ("Guerrero") (PSR ¶ 27). The UC met with Guerrero and Guzman five days later, on or about February 16, 2013, in Manhattan, to discuss the logistics of the DTO's first "test" shipment of approximately 150 kilograms of cocaine, which was already loaded onto a containership destined for New York, as well as the UC's payment for unloading this shipment, and the prospect of future, larger narcotics loads (PSR ¶¶ 28-31). However, unbeknownst to this group, on that very same day, the Ecuadorian National Police seized the container destined for the Terminal at the port in Guayaquil, Ecuador (PSR ¶ 32). In it were approximately 182 kilograms of cocaine (PSR ¶ 32).

About a week later, the UC received electronic communications from Gil, indicating that the cocaine shipment had been seized in Ecuador, which cost the DTO one million dollars, but that they were planning another shipment of 50 kilograms deporting from the Dominican Republic (PSR ¶¶ 33-34). As noted above, the defendant remained in the DR and did not return to the U.S. following this seizure. While in the DR, the defendant obtained fraudulent identity and travel documents in another name, in order to flee to a non-extradition country to avoid arrest and prosecution.

On June 19, 2013, the defendant, along with Gil, Guzman, and Guerrero, were all charged in a sealed, single-count Complaint, captioned 13 Mag. 1593, with conspiracy to import cocaine into the United States. On August 12, 2013, a grand jury sitting in this District returned a sealed, single-count Indictment, captioned 13 Cr. 611 (LAP), charging the defendant and Guerrero with conspiracy to import into the United States five kilograms and more of mixtures and substances containing a detectable amount of cocaine, from at least in or about January 2012, up to and including in or about February 2013, in violation of Title 21, United States Code, Sections 960(b)(1)(B)(ii) and 963 (PSR ¶¶ 1-2). Warrants issued for their arrests on this charge.

The Government subsequently initiated the defendant's extradition from the Dominican Republic, and requested that Dominican authorities effect his arrest. On or about November 21, 2015, Dominican authorities took the defendant into custody (PSR ¶ 35). Extradition proceedings in the DR followed, and the defendant was ultimately transferred to United States custody on or about March 25, 2016.

---

[1]   The defendant did, in fact, travel from Ecuador to the Dominican Republic to coordinate the shipment with Gil before planning to return to New York to meet the shipment upon arrival. His role was primarily to oversee money transfers back to the DTO in the DR following the successful sale of the cocaine by Guzman and Guerrero in New York. However, as further described herein, the defendant never returned to New York after the shipment of cocaine was seized by Ecuadorian authorities.

In a "safety valve" proffer held on or about July 21, 2016, the defendant provided truthful information to the Government about his involvement in the charges contained in the Indictment, and responded to questions, and, as a result, the Government has determined that he qualifies for relief pursuant to U.S.S.G. §§ 2D1.1(b)(17) and 5C1.2(a), and Title 18, United States Code, Section 3553(f).

On or about July 26, 2016, the defendant pled guilty as charged before Your Honor, pursuant to a plea agreement (PSR ¶ 3). The defendant's plea agreement, dated July 21, 2016, contained a stipulated Guidelines range of 108 to 135 months' imprisonment, and indicated that the parties agree that neither a downward departure nor an upward departure from that range is warranted (PSR ¶ 3). The plea agreement further indicated that, as noted above, the defendant appears to satisfy the conditions set forth in 18 U.S.C. § 3553(f) for relief from the otherwise-applicable statutory mandatory minimum sentence of 120 months' imprisonment, and that, absent new information, the Government will take the position that the statutory mandatory minimum sentences does not apply.

The PSR calculates the defendant's criminal history score to be zero points, placing him in Criminal History Category I (PSR ¶¶ 52-54), as the instant case appears to be his very first brush with law enforcement. The PSR calculates the defendant's total offense level to be 31, based upon his participation in a conspiracy to import between 150 kilograms and 450 kilogram of cocaine, his satisfaction of the "safety valve" criteria, and his acceptance of responsibility (PSR ¶¶ 41-51). Based on an adjusted total offense level of 31, and a Criminal History Category of I, the defendant's advisory Guidelines range is 108 to 135 months' imprisonment (PSR ¶ 84). This calculation is identical to stipulated Guidelines range contained in the plea agreement (PSR ¶ 85).

The defendant accepts this calculation (Def. Mem. 2), but submits that a non-Guidelines variant sentence of time served – *i.e.*, one year of imprisonment, which would amount to a *massive* 96-month downward variance – is appropriate, in order to afford the defendant an opportunity to enter into a drug treatment program, to care for his daughter, and to return to gainful employment.

<u>Discussion</u>

A. <u>Applicable Law</u>

The Sentencing Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range;" that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the

history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

## B. A Departure Based on Prison Conditions Is Not Appropriate

This Court should not grant a downward departure based on the allegedly unduly harsh conditions endured by the defendant during the approximately four months he spent in a jail facility in the Dominican Republic awaiting his extradition to the United States in this case. *See* U.S.S.G. § 5K2.0 (Policy Statement); 18 U.S.C. § 3553(b)); *United States* v. *Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.").

The defendant is not legally entitled to a departure on these grounds. While the Second Circuit has held that pre-sentence conditions of confinement may, in appropriate cases, be a permissible basis for downward departures, *see Carty*, 264 F.3d at 196, courts in this District have granted relief only "where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner." *Chue* v. *United States*, Nos. 04 Civ. 8668 (RLC), 94 Cr. 626 (RLC), 2010 WL 2633861 at *2 (S.D.N.Y. June 29, 2010) (quoting *United States* v. *Mateo*, 299 F.Supp.2d 201, 208 (S.D.N.Y. 2004)). Indeed, even the subsequent history of the *Carty* case belies the assertion that *Carty* warrants a departure here. In *Carty*, the Second Circuit did not affirm a downward departure based on conditions of pretrial confinement, but merely remanded the case to the District Court so that it might "reconsider the defendant's request for a downward departure . . . in light of this holding." *Carty*, 264 F.3d at 197. On remand, the late Honorable Allen G. Schwartz carefully considered the defendant's downward departure motion, which was based on the conditions of the Dominican prison where the defendant was held prior to his extradition. Carty had alleged that during the period of his confinement in the Dominican Republic he was subjected to cruel prison conditions. Specifically, Carty alleged that:

> He was held in a *four-foot by eight-foot cell with three or four other inmates*. There was *no light* in his cell. He received ten to fifteen minutes per day outside of his cell to bathe and was allowed to make only one phone call per week. He had *no running water in his cell. His only toilet was a hole in the ground*. He was denied access to paper, pens, newspaper, and radio. While incarcerated in the Dominican Republic, he *lost forty pounds*.

*Id.* at 193 (emphasis added).

Notwithstanding these substandard conditions – which Carty endured for approximately nine months, from May 14, 1999 until February 5, 2000 – Judge Schwartz rejected Carty's motion for a downward departure, finding that "in the totality of these circumstances . . . I decline in my discretion to grant him a downward departure as a result of his incarceration with adverse conditions . . . which took place in the Dominican Republic." (Transcript of Court Proceedings, *United States* v. *Carty*, 95 Cr. 973 & 980 (AGS), dated November 9, 2001, at 24).

If the conditions of Carty's confinement were insufficient to justify a downward departure, then the defendant's conditions, which he vaguely alleges were "squalid … with very little clean water or food," where he was "subjected to violence," (Def. Mem. 6), and in which he suffered for five months *less* than Carty suffered in his, are at least equally unavailing. Additionally, as several courts in this District have noted, a departure on the basis of the conditions of presentence confinement "lies only 'where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner.'" *United States* v. *Green*, No. 04 Cr. 424 (RWS), 2006 U.S. Dist. LEXIS 87878, at *12 (S.D.N.Y. Dec. 1, 2006) (quoting *United States* v. *Torres-Teyer*, 322 F. Supp. 2d 359, 377 (S.D.N.Y. 2004)). Accordingly, downward departures based on prison conditions are typically granted only in the most extreme cases. *See, e.g.*, *United States* v. *Mateo*, 299 F. Supp. 2d 201, 207-11 (S.D.N.Y. 2004) (granting downward departure where defendant was sexually abused and denied medical treatment during the birth of her child); *United States* v. *Rodriguez*, 213 F. Supp. 2d 1298 (M.D. Ala. 2002) (granting downward departure where defendant was raped by prison guard); *United States* v. *Francis*, 129 F. Supp. 2d 612 (S.D.N.Y. 2001) (granting downward departure where inmate was victim of attempted knife slashing, was repeatedly threatened, and suffered severe psychological distress).

Many courts have found that downward departures are not appropriate for defendants incarcerated abroad under circumstances similar to those alleged by this defendant, but for even longer periods of time. For example, in *Isaza* v. *United States*, No. 06-2687 (WHW), 2007 WL 2226015 (D.N.J. Aug. 1, 2007), the Court noted that a downward departure would not have been appropriate for a defendant who spent thirteen months in pretrial detention in a Colombian prison, finding that his situation "certainly does not reach the level needed to grant a downward departure." The Court made clear that "[t]he defendant must produce evidence indicating that the conditions were atypical as compared with other jails. The cases in which downward departures have been granted involve long periods of incarceration in deplorable conditions that typically include situations where the inmate was subjected to physical abuse and/or sexual abuse while imprisoned." *Id.* at *3. The Court further noted that many of the conditions the defendant

complained of, including cold conditions, poor food, and abusive treatment of visiting relatives, were "common to all inmates and do not take this case to the atypical level." *Id.* at *4. *See also Torres-Teyer*, 322 F. Supp. 2d at 378 (declining to depart downward for inadequate prison conditions during defendant's pretrial detention in Belize because no showing had been made that those conditions were "extreme to an exceptional degree" or that they fell upon the defendant in "some highly unique or disproportionate manner") (quoting *Mateo*, 299 F. Supp. 2d at 208); *United States* v. *Ogembe*, 41 F. Supp. 2d 567, 571 (E.D. Pa. 1999) (declining to award downward departure for conditions of confinement where defendant claimed facility where he was housed lacked running water, was overcrowded, and was infested with rodents).

Here, the defendant has not shown that the conditions he suffered in the Dominican Republic for four months were "extreme to an exceptional degree," nor that they fell on him in "some highly unique or disproportionate manner," such as would warrant a downward departure in this case. *Mateo*, 299 F. Supp. 2d at 208.

C. Any Credit Based on Time Served in the Dominican Republic Is To Be Awarded By the Bureau of Prisons

Pursuant to Title 18, United States Code, Sections 3585 and 4105, the defendant will be given credit for his time spent in prison facilities in the Dominican Republic by the Federal Bureau of Prisons ("BOP"). This Court should not reduce the defendant's sentence to account for his time spent in a Dominican prison awaiting extradition; indeed, to do so would constitute error.

The statutory authority for the defendant to receive credit for time spent in jail in the DR awaiting extradition appears in 18 U.S.C. § 3585(b), which reads, in relevant part: "Credit for Prior Custody. – A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences – (1) as a result of the offense for which the sentence was imposed."

The District Court does not have the authority to credit this period to the defendant. Rather, any adjustment to the sentence for time in the DR rests in the control of the BOP. *See United States* v. *Wilson*, 503 U.S. 329, 334 (1992) (holding that under 18 U.S.C. § 3585(b), the Attorney General, not the district court, is authorized to compute the credit an inmate should receive for a prior period of incarceration); *Werber* v. *United States*, 149 F.3d 172, 179 (2d Cir. 1998) ("[O]nly the BOP is entitled to give credit for time served prior to the commencement of a sentence."). Similarly, it is also within the BOP's exclusive responsibility to credit the defendant for time he has served in the Metropolitan Correctional Center ("MCC"), and this should not be calculated in the Court's imposition of sentence. Indeed, it would be error for the District Court to give such credit. *United States* v. *Los Santos*, 283 F.3d 422, 427 (2d Cir. 2002) (district court abused its discretion by departing in order to credit Los Santos with the time from his transfer to federal custody to the date of sentencing eight months later, and effectively "double-crediting" defendant for his time served).

Therefore, the Court should not grant any downward departure based upon time the defendant served in the Dominican Republic. The decision whether to award any such credit is the exclusive province of the BOP. That said, the Government has conferred with Senior Counsel

for the Federal Bureau of Prisons Designation and Sentence Computation Center, who indicated that the BOP *will* credit the time the defendant spent incarcerated in the DR awaiting extradition as prior custody credit. BOP Counsel suggested that Your Honor note specifically in the Judgement of Conviction the recommendation to the BOP that the defendant is to be given credit for all time served in custody in the Dominican Republic awaiting extradition from approximately November 21, 2015.

### D. A Guidelines Range Sentence Is Appropriate

The factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a Guidelines-range sentence of incarceration for this defendant.

The conduct in this case was extremely serious: the defendant was involved in a conspiracy to import *nearly two hundred kilograms* of cocaine into the United States, sourced from the Dominican Republic and transported through ports in South America, for further distribution in the New York area, to turn a significant profit. The defendant was more than a mere "broker" for this transaction (Def. Mem. 6). The defendant's role was crucial to the success of the enterprise. For this initial "test" shipment, the defendant met with the undercover agent to discuss the terms of payment and the quantity of the shipment, and then left the country to assist the leader of the DTO abroad in coordinating the shipment through Ecuador and attempting to procure cheaper product. Once the shipment arrived in the U.S., the defendant was expected back in New York to assist with transmitting the profits of the cocaine sales to the Dominican Republic. This mere test shipment alone amounted to over 180 kilograms of cocaine, and the DTO was already planning to ship another load of narcotics when the time was right.

Although this was the defendant's first encounter with law enforcement, it is inaccurate to characterize his life as wholly law-abiding up until his involvement in this importation conspiracy. In fact, when he did not have a job, the defendant made money by selling drugs in New York – specifically, cocaine and marijuana – with some of the members of this conspiracy prior to his involvement in the instant offense. The defendant was simply never arrested for or charged with this conduct. Indeed, it was his prior involvement in the drug business with these individuals that made the defendant a trusted member of the DTO.

Conclusion

      Given all of the foregoing, the Government respectfully requests that this Court impose a sentence within the applicable Guidelines range of 108 to 135 months' imprisonment – a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing, including and especially, to reflect the seriousness of the offense; promote respect for the law; and afford adequate general and specific deterrence.


                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney


            by:   /s/ Justina L. Geraci_____
                    Justina L. Geraci
                    Assistant United States Attorney
                    (212) 637-2468


cc:     John C. Meringolo, Esq.
          Meringolo & Associates, P.C.